<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| CHRIS SAFARY, | Case No.: 2:17-cv-07163 (PAZ) |
| Plaintiff, | **OPINION** |
| v. | |
| ANDREW SAUL,<br>Commissioner of Social Security, | |
| Defendant. | |

**APPEARANCES:**

SHERYL GANDEL MAZUR, ESQ.
195 FAIRFIELD AVENUE
SUITE 2C
WEST CALDWELL, NJ 07006

 On behalf of Plaintiff

SHAWN CHEREE CARVER
ASSISTANT UNITED STATES ATTORNEY
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 GARDEN SPRING STREET
PHILADELPHIA, PA 19123

 On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

 This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff, Chris Safary, for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.)

and for Supplemental Security Income under Title XVI of the Social Security Act (42 U.S.C.

§§ 1381, et seq.). Plaintiff appeals from the final decision of the Administrative Law Judge

("ALJ") denying the applications; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcript, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case in accordance with the following instructions.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB on September 13, 2013 and an application for SSI on September 23, 2013 alleging a disability onset date of March 1, 2013.  (R. 81, 87.)[2]  On November 18, 2013, the Commissioner determined that Plaintiff was not disabled and denied the applications.  (R. 81, 87.)  On March 21, 2014, Plaintiff's applications were denied on reconsideration.  (R. 93, 103.)  On November 18, 2015, an ALJ held a hearing on Plaintiff's applications; Plaintiff was represented by counsel at the hearing.  (R. 24.)  On January 15, 2016, the ALJ issued a decision denying Plaintiff's applications.  (R. 21.)  On July 21, 2017, the Appeals Council denied Plaintiff's request for review, thereby affirming the ALJ's decision as the "final" decision of the Commissioner.  (R. 1.)  On September 15, 2017, Plaintiff filed this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  ECF No. 1.  On June 26, 2019, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C.

---

[1] On June 17, 2019, Andrew Saul was sworn in as Commissioner of Social Security for a six-year term that expires on January 19, 2025.  Mr. Saul is therefore substituted as Defendant in his official capacity.

[2] "R." refers to the continuous pagination of the administrative record on appeal.  ECF No. 7.

§ 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 29.[3]  On September 17,

2019, the case was reassigned to the undersigned Magistrate Judge.  ECF No. 31.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority

to conduct a plenary review of legal issues decided by the ALJ.  *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are

supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42

U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable

amount of evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101

L. Ed. 2d 490 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of

Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Substantial

evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla[.]'"  *Bailey

v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted);

*see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be

set aside merely because the Court "acting *de novo* might have reached a different conclusion."

*Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986), *cert. denied*, 481 U.S. 1069, 107

S. Ct. 2461, 95 L. Ed. 2d 870 (1987); *see also*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir.

2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review
of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J.
Apr. 2, 2018).

those findings, even if we would have decided the factual inquiry differently.")(citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication[.]" *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "'review the evidence in its totality'" and "'take into account whatever in the record fairly detracts from its weight.'" *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)(substantial evidence exists only "in relationship to all the other evidence in the record."), *reh'g denied,* 650 F.2d 481 (3d Cir. 1981). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision must be set aside if it did not take into account the entire record or failed to resolve an evidentiary conflict. *See Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d

4

501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000));
*see K.K.*, 2018 WL 1509091, at *4.  The ALJ must provide "an explanation . . . of the reason why
probative evidence has been rejected . . . so that a reviewing court can determine whether the
reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07; *see Burnett*, 220 F.3d at 121
("Although the ALJ may weigh the credibility of the evidence, he must give some indication of
the evidence which he rejects and his reason(s) for discounting such evidence.") (citing *Plummer
v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)).  "[T]he ALJ is not required to supply a comprehensive
explanation for the rejection of evidence; in most cases, a sentence or short paragraph would
probably suffice."  *Cotter v Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent such articulation,
the Court "cannot tell if significant probative evidence was not credited or simply ignored."
*Cotter*, 642 F.2d at 705.  As the Third Circuit notes:

> [U]nless the [ALJ] has analyzed all evidence and has sufficiently
> explained the weight he has given to obviously probative exhibits,
> to say that his decision is supported by substantial evidence
> approaches an abdication of the court's duty to scrutinize the record
> as a whole to determine whether the conclusions reached are
> rational.

*Gober*, 574 F.2d at 776 (internal quotations omitted); *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can
enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or
without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Remand is appropriate if the
record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or
contradictory findings.  *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,
221-22 (3d Cir. 1984).  Remand is also appropriate if the ALJ's findings are not the product of a
complete review which "'explicitly' weigh[s] all relevant, probative and available evidence" in the
record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *see A.B. on Behalf of Y.F. v. Colvin*, 166

F. Supp. 3d 512, 518 (D.N.J. 2016).  A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citations omitted); *see A.B.*, 166 F. Supp. 3d at 518.  In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays.  *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  An award is "especially appropriate" when "further administrative proceedings would simply prolong [a plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

### B.    Standard for Awarding Benefits

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a).[4]   An impairment is "medically determinable" if it results from anatomical, physiological, or

---

[4] Disability Insurance Benefits (*see* 42 U.S.C. §§ 401, et seq.) and Supplemental Security Income (*see* 42 U.S.C. §§ 1381, et seq.) are separate programs under Title II and Title XVI, respectively, of the Social Security Act. Although they are subject to different qualification requirements, the standard for determining whether a claimant is disabled is the same for both programs. *See Rutherford v. Barnhart*, 399 F.3d 546, 551 n.3 (3d Cir. 2005) (citation omitted). The Court endeavors to provide citations to the applicable regulations for each program but may provide citations only to the disability insurance benefits regulations.  *See Carmon v. Barnhart*, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (explaining that because "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and [supplemental security income]," "[w]e provide citations only to the regulations respecting disability insurance benefits").

psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1529(b), 416.929(b). Thus, an impairment can be established by objective medical evidence from an acceptable medical source but cannot be established by a claimant's statement of symptoms, a diagnosis, or a medical opinion. 20 C.F.R. §§ 404.1521, 416.921.

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[5] The claimant bears the burden of proof at Steps One through Four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019) (citing *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010)). At Step Five, the burden shifts to the Commissioner. *Id*. At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, then the inquiry ends because the claimant is not disabled. Otherwise, the ALJ proceeds to Step Two.

At Step Two, the ALJ decides whether the claimant has any "severe impairment" or combination of impairments that meets certain regulatory requirements. 20 C.F.R. §§ 404.1520(c), 416.920(c); *see Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) (this Step "is a *de minimis* screening device to dispose of groundless claims"). A "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. § 404.1527.

C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled. Otherwise, the ALJ proceeds to Step Three.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months. *Id*. §§ 404.1509, 416.909.  Otherwise, the ALJ proceeds to Step Four.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC") and determine whether the claimant can perform past relevant work.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  The RFC is the claimant's maximum ability to do physical and mental work activities on a sustained basis despite limitations from impairments.  Social Security Ruling 96-8p, *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).  Past relevant work is performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last fifteen years or fifteen years prior to the disability date.  20 C.F.R. §§ 404.1560(b)(1), 404.1565(a), 416.960(b)(1), Social Security Ruling 82-61, *Titles II and XVI: Past Relevant Work – The Particular Job or the Occupation as Generally Performed*, 1982 WL 31387, at *1-2 (S.S.A. Jan. 1, 1982).  In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  *Id.* §§ 404.1560(b)(1), 416.960(b)(1).  If the claimant can perform past relevant work, then the inquiry ends because the claimant is not disabled.  Otherwise, the ALJ proceeds to Step Five.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy.   20 C.F.R. §§ 404.1520(g), 416.920(g).   Depending on the claimant's limitations, the ALJ will either follow the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2, or use the Grid Rules as a framework for decision-making.   20 C.F.R. §§ 404.1569a, 416.969a. The ALJ's consideration at this Step "typically involves 'one or more hypothetical questions posed by the ALJ to [a] vocational expert.'" *Hess*, 931 F.3d at 204 (quoting *Podedworny*, 745 F.2d at 218).   If the ALJ determines that the claimant can perform other jobs that exist in significant numbers in the national economy, then the claimant is not disabled.   Otherwise, the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 51 years old on the alleged onset date of March 1, 2013.  (R. 82.)[6]  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 26.)   At Step Two, the ALJ found that Plaintiff had the following severe impairments: human immunodeficiency virus ("HIV"), Hepatitis C, and minor vision and back issues.  (R. 26.)   At Step Three, the ALJ found that Plaintiff did not have an impairment or

---

[6] The relevant period for Plaintiff's SSI application is September 23, 2013 (application date) through January 15, 2016 (decision date).  The ALJ found that the relevant period for Plaintiff's DIB application is March 1, 2013 (alleged onset date) through December 31, 2017 (date last insured).  (R. 26.)   Plaintiff argues that the ALJ's determination of the date last insured was erroneous, as Plaintiff's earnings record demonstrates that Plaintiff was insured through December 31, 2018.  ECF No. 19 at 2 n.1.  Defendant does not dispute Plaintiff's assertion.  The date last insured is not material to the Court's analysis of Plaintiff's appeal but, on remand, the ALJ should address the issue of Plaintiff's date last insured.

combination of impairments that meets or medically equals the severity of any Listing. (R. 27.) At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels subject to various non-exertional limitations. (R. 27.) Specifically, the ALJ found as follows:

> I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitaitons: some limits to binocular vision. He has sufficient visual acuity to be able to handle and work with both large and small objects but must avoid normal workplace hazards and is precluded from working at unprotected heights.

(R. 27.) The ALJ also found at Step Four that Plaintiff was able to perform past relevant work as a grave digger (DOT #406.684-010). (R. 32.) The ALJ concluded that Plaintiff was not disabled from March 1, 2013 through January 15, 2016. (R. 32.)

Plaintiff offers three arguments on appeal. He first contends that the ALJ's RFC assessment is not supported by substantial evidence, noting in particular that the record evidence demonstrates that Plaintiff cannot perform heavy work and has visual limitations that were not addressed by the ALJ. Second, Plaintiff asserts that the ALJ erred in finding that Plaintiff can perform his past relevant work as a grave digger. Third, Plaintiff argues that the ALJ improperly evaluated Plaintiff's subjective complaints of pain. Plaintiff asks the Court to reverse and remand for a new hearing. Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

## IV.    SUMMARY OF RELEVANT EVIDENCE

### A.    Medical Evidence

#### 1.    Treating Providers

The record contains treatment notes from Paterson Counseling Center from January 2012

through March 2015, which reflect observations during Plaintiff's annual physical exams and follow-up visits every two months.  At these visits, Plaintiff generally reported no complaints and the records demonstrate that while Plaintiff was diagnosed with HIV, his condition was stable. Several of these records reflect that Plaintiff's neurological condition was "nonfocal."  (R. 335, 336, 338, 339, 340, 342, 443, 484.)  In March 2012, Plaintiff presented for an annual physical exam and had no complaints at that time.  (R. 443.)  Plaintiff had a full range of motion and no edema, and there were no abnormal findings during his exam.  (R. 443.)  In May 2012, Plaintiff reported that he had low grade back pain but otherwise felt fine.  (R. 337.)  In July 2012, Plaintiff reported loss of hair and low energy and he was diagnosed with possible hypogonadism.  (R. 338.) In October 2012, Plaintiff again reported occasional tiredness.  (R. 339.)  In March and May 2013, Plaintiff reported that he had no complaints and felt fine.  (R. 340-41.)  Plaintiff similarly reported no complaints at his follow-up appointments in July and October 2013.  (R. 342-43.)  In January 2014, Plaintiff reported constipation but otherwise felt well.  (R. 484.)  In March 2015, Plaintiff's examination yielded no abnormal results, but records indicate that he had "wasting syndrome." (R. 488.)[7]

Ronald Willenborg, M.D., who treated Plaintiff since 1997, provided a residual functional capacity assessment on August 13, 2014.  (R. 383, 392.)  Dr. Willenborg diagnosed Plaintiff with 4th nerve palsy, Hepatitis C, and HIV, and identified Plaintiff's symptoms as diplopia, neck and back pain, severe fatigue and severe anxiety.  (R. 383.)  These symptoms, according to Dr.

---

[7] In January 2012, Plaintiff weighed 145 pounds (R. 336); in May 2012 he weighed 142 pounds (R. 337); in July 2012, he weighed 141 pounds.  (R. 338.)  He weighed 141 pounds in October 2012, but by March 2013, he weighed 150 pounds again.  (R. 339, 340.)  He weighed 149 pounds in October 2013.  (343.)  Plaintiff weighed 149 pounds in January 2014.  (R. 484.)  He weighed 144 pounds in March 2015.  (R. 478.)

Willenborg, are constantly severe enough to interfere with Plaintiff's attention and concentration. (R. 383.) Dr. Willenborg also noted that Plaintiff's HIV medication causes gas and bloating. (R. 383.) He opined that Plaintiff could sit for 15 minutes at a time, stand/walk for 20 minutes at a time, sit for 0 total hours in a workday, and stand/walk for 1 total hour in a workday. (R. 383.) Dr. Willenborg wrote that Plaintiff would need to take unscheduled breaks during the workday, and that each break would last twenty to thirty minutes. (R. 383.) Dr. Willenborg did not indicate the number of breaks that Plaintiff would require each day. (R. 383.) Dr. Willenborg opined that Plaintiff can frequently lift less than ten pounds but could never lift ten pounds or more. (R. 384.) He noted limitations in reaching, handling, and fingering, and further noted that Plaintiff would be absent from work more than four times per month as a result of his conditions. (R. 384.)

Plaintiff also sought treatment from Jay M. Bernstein, M.D., an ophthalmologist, relating to his vision impairment. Dr. Bernstein saw Plaintiff on September 12, 2013, at which time he noted that Plaintiff had diplopia and 4th nerve palsy of the right eye. (R. 389.) He observed at that time that Plaintiff's vision in each eye was 20/30. (R. 389.) With respect to motility, there was "marked overaction of the right inferior oblique." (R. 389.) Dr. Bernstein opined that Plaintiff's 4th nerve palsy could be controlled with prisms and recommended that Plaintiff obtain an MRI. (R. 389.) On October 24, 2013, Plaintiff's vision in each eye was 20/20 without glasses, and Dr. Bernstein's impression was that Plaintiff had single vision with prism lenses. (R. 388.)

Dr. Bernstein completed a residual functional capacity questionnaire on November 21, 2013, noting that Plaintiff has 4th nerve palsy with spread which "can improve with prism glasses." (R. 491.) This condition, according to Dr. Bernstein, was constantly severe enough to interfere with Plaintiff's attention and concentration. (R. 491.) He opined, however, that Plaintiff is capable of working a full day "if the prism work[s]." (R. 492.) In a letter dated December 9, 2013, Dr.

12

Bernstein wrote that Plaintiff has a nine-year history of diplopia caused by 4th nerve palsy with spread and indicated that he prescribed a pair of prism glasses in an attempt to control the diplopia. (R. 387.)  Dr. Bernstein stated: "I do not know to what extent he will be able to work – or may be limited to certain types of jobs based on visual demands."  (R. 387.)  Dr. Bernstein further explained that "[i]f his diplopia is completely controlled, he would then be able to work a 'normal job.'"  (R. 387.)  In September 2014, however, Dr. Bernstein found that Plaintiff's 4th nerve palsy could not be controlled with prisms, and he noted that he "would not recommend surgery unless able to control the eyes with prisms[.]" (R. 495.)  He also opined that Plaintiff has limited fusion of his vision and recommended that he be considered disabled.  (R. 495.)  Dr. Bernstein also completed a disability evaluation on September 4, 2014, noting that Plaintiff has "chronic diplopia" and is "unable to fuse with prisms."  (R. 501.)  Dr. Bernstein noted that surgery is not recommended and that Plaintiff should be considered visually disabled due to chronic diplopia. (R. 501.)

The record contains treatment notes from S. Charles Oh, M.D. of Montclair Gastroenterology Consultants, LLC.  Plaintiff completed a form for Dr. Oh in which he was to identify any symptoms that he experienced, but Plaintiff did not check any boxes, including those for "trouble with eyes or vision" or "fatigue," nor did he indicate that he had any gastrointestinal problems, such as recent weight loss, bloating, or nausea.  (R. 404-05.)  Plaintiff saw Dr. Oh in May 2014 regarding pain in his left abdomen.  (R. 409.)  At that time, Plaintiff weighed 144 pounds and examination appeared normal.  (R. 409.)  Dr. Oh ordered imaging tests of Plaintiff's gastrointestinal system.  (R. 409.)  In August 2014, Dr. Oh prescribed medication to treat Hepatitis C.  (R. 406.)  In March 2015, Plaintiff saw Dr. Oh regarding a body odor issue.  (R. 402.)  At his appointment, Plaintiff weighed 146 pounds and exam findings were normal.  (R. 402.)  An

abdominal ultrasound performed on March 12, 2015 demonstrated that Plaintiff's liver had a normal appearance with no evidence of fatty infiltration or focal lesion. (R. 397.) There was biliary dilation with no evidence of an obstructing mass or calculus in the gallbladder or bile duct. (R. 397.) A CT exam of the pancreas was recommended. (R. 397.) In November 2015, Dr. Oh noted that Plaintiff was "[c]urrently undergoing treatment for HIV but not for Hep C due to insurance coverage issues." (R. 496.) He further noted Plaintiff's complaint of mild abdominal pain, but also stated that he is "unable to determine the effect on [Plaintiff's] ability to function in his daily life, since the Hep C is a chronic, slowly progressive disease." (R. 496.)

Finally, the record contains a treatment note from Dr. Chase dated September 24, 2015. (R. 498.) Dr. Chase noted that Plaintiff "has had a longstanding history of low back pain, nonradiating, without any peripheral complaints." (R. 498.) Upon examination, Plaintiff had "painful lumbar mobility" but his neurologic exam was intact; his x-rays showed some degenerative arthritis, and he diagnosed Plaintiff with lumbar disc disease. (R. 498.) He suggested that Plaintiff take an anti-inflammatory medication and follow a rehab program. (R. 498.)

## 2. Consultative Examiners

Plaintiff was examined by Rahel Eyassu, M.D., a consultative examiner, on January 28, 2014. At that time, Dr. Eyassu noted that Plaintiff's chief complaint was double vision from the right eye. (R. 373.) Upon examination, Dr. Eyassu observed that Plaintiff was in no acute distress, his gait and station were normal, he could squat and walk on his heels and toes, and he had full range of motion in the upper and lower extremities as well as the cervical spine. (R. 374.) Dr. Eyassu also noted there was straightening of the normal lumbar lordosis, and no paralumbar spine muscle tenderness, with full range of motion. (R. 374.) Straight leg raising tests were normal in the supine and sitting positions. (R. 374.) Dr. Eyassu further noted that there was a slight

misalignment of Plaintiff's eyes. (R. 374.) Dr. Eyassu diagnosed Plaintiff with unilateral 4th nerve palsy with double vision; HIV, asymptomatic status; Hepatitis C, no history of decompensated liver disease; and chronic low back pain. (R. 374-75.) Dr. Eyassu also added a notation that Plaintiff had an abnormal liver function test due to his history of Hepatitis C, and an abnormal x-ray with mild COPD changes, which he noted was asymptomatic. (R. 375.) Dr. Eyassu concluded that Plaintiff was "[a] 51-year-old male with above history, with limitation in vision. He would need to avoid activity with heavy lifting." (R. 375.)

### 3. State Agency Reviewing Consultants

On November 18, 2013, Morris Ferman, M.D. assessed Plaintiff's condition as follows:

> 51 year old claimant alleges HIV, HepC and nerve palsy. The medical records in file indicate unremarkable physical exams with stable lab counts. The function report in file indicates no functional limitations. In my judgment this condition is rated as "not severe". As far as the double vision mentioned in the function report, Hepatitis C and nerve palsy the medical records showed no such MDI's evidence. Therefore these conditions are all rated as "no MDI".

(R. 85, 91.) Dr. Ferman concluded that Plaintiff was "not disabled." (R. 86, 92.)

On February 6, 2014, Algernon Phillips, M.D. noted upon reconsideration of Plaintiff's applications that Plaintiff has intermittent diplopia of the 4th nerve palsy. (R. 100, 110.) He noted that Plaintiff has good visual acuity and field and can handle both large and small objects, but due to limited depth perception Plaintiff is precluded from working at unprotected heights and must avoid normal workplace hazards. (R. 100-01, 110-11.) He found Plaintiff was not disabled. (R. 101, 111.)

### B. Non-Medical Evidence

### 1. Function Report

Plaintiff completed a Function Report on October 12, 2013, in which he reported that he

does nothing all day. (R. 211.) He indicated that he takes care of his cat by feeding and grooming it, and he has no problems with sleep or personal care. (R. 212.) Plaintiff prepares his own meals, has had no changes in cooking habits since his impairments began, does his own laundry without assistance, does his own grocery shopping, pays bills, and handles a savings account. (R. 213-14.) Plaintiff drives a car, goes out by himself and plays the guitar once in a while. (R. 214-15.) He does not socialize with others but has no problems getting along with family, friends, neighbors or others. (R. 215.) Plaintiff reported that he does not do yard work because of his vision condition. (R. 213.) In assessing his physical abilities, Plaintiff noted only that he has a problem seeing because he experiences double vision due to a weak eye muscle. (R. 215-16.) He did not identify any other activity that causes him difficulty, such as lifting, squatting, walking, sitting, bending, standing, reaching, or kneeling. (R. 215-16.) Plaintiff noted that he has no problem with concentration, and he follows instructions well. (R. 216.) Plaintiff indicated that he was laid off from his job at the cemetery because the entire crew was "let go." (R. 217.) Plaintiff noted that he was prescribed glasses 30 years ago for reading and watching television. (R. 217.)

### 2.    Work History Report

In a Work History Report completed on October 12, 2013, Plaintiff reported that he was a cemetery worker from April 1998 to May 2013. (R. 203.) In this position, he performed general cemetery maintenance, dug graves, fixed up graves and "ran" funerals. (R. 204.) He was required to use machines, tools or equipment, use technical knowledge or skills, lift and carry boards ranging from 8 feet x 2 inches to "plywood covers 10 x 10." (R. 204.) Plaintiff reported that the heaviest weight he lifted was fifty pounds, and he frequently lifted twenty-five pounds. (R. 204.) His job also required him to walk, stand, kneel, crouch, and handle, grab or grasp big objects. (R. 204.)

### 3.    Disability Reports

In a disability report completed for purposes of appeal on December 13, 2013, Plaintiff indicated that his "eye problems make[] all tasks difficult and unsafe to perform."  (R. 222.)  In another disability report dated April 14, 2014, Plaintiff reported that he does not have energy, has been losing weight, and that there "has been an increase in the severity of [his] eye condition."  (R. 228.)

### 4.    Hearing Testimony

Plaintiff testified that he was a maintenance worker in a cemetery in his past job.  (R. 45.)  On a daily basis, Plaintiff would lift between fifteen and 150 pounds.  (R. 45.)  The heaviest items he had to lift were granite stones, but he also had to maneuver large boards over the graves once they were dug.  (R. 46.)  Plaintiff testified that he had to shovel dirt and rake, and he also dug graves with a machine.  (R. 46.)  He had performed this work for the past fifteen years.  (R. 47.)  His job at the cemetery ended when the entire crew was laid off for monetary reasons.  (R. 47.)

Concerning his medical conditions, Plaintiff testified that he was diagnosed with Hepatitis C in 1992.  (R. 47-48.)  He said that due to this condition, he sometimes experiences pain in his liver but mostly he experiences fatigue.  (R. 48.)  Plaintiff testified that he was also diagnosed with HIV in 1992.  (R. 48.)  He takes medication for HIV, which causes fatigue and gastrointestinal problems such as bloating, nausea, and constipation.  (R. 48-49.)  Plaintiff stated that the worst side effect of the medication is "wasting," which "literally sucks the fat out of your cells" and renders him unable to gain weight.  (R. 48.)  Plaintiff testified that he is 5'8" and, at the time of the hearing, he weighed 135 pounds.  (R. 49.)  He takes medication to help him gain weight, but it does not work.  (R. 48.)  The most he has weighed in the past three years is 150 pounds.  (R. 48-49.)  Plaintiff also has taken methadone for the past 22 years because he was formerly a heroin

addict.  (R. 49-50.)  He is a smoker and has been diagnosed with mild COPD.  (R. 51-52.)  He experiences shortness of breath upon exertion, such as when he climbs to the third story of his house.  (R. 52.)  Plaintiff goes to the doctor every three months for monitoring of his HIV condition, but he does not see other doctors regularly.  (R. 72.)

Plaintiff testified that he experiences lower back pain and cannot sit for more than twenty minutes without his back hurting.  (R. 53.)  He must then stand and stretch for ten or fifteen minutes.  (R. 54.)  He represented that he has been diagnosed with arthritis and degenerative disc disease.  (R. 53.)  His attorney indicated that he also has been diagnosed with straightening of the lumbar lordosis.  (R. 53-54.)  Plaintiff testified that he is taking an anti-inflammatory medication for his back pain that does not provide relief.  (R. 54.)  Plaintiff stated that his back condition caused him to miss work numerous times over the years because he will "throw out [his] back" just by looking or turning the wrong way.  (R. 66.)  He has to rock back and forth when sitting to keep his back moving because sitting for long periods causes pain; at the hearing he supported himself on his elbows to avoid putting all of the weight on his lower back.  (R. 69.)  He has never had an epidural injection or back surgery.  (R. 71.)  He only saw an orthopedic doctor for his back condition three weeks prior to the hearing, but he said he "should have just gone to this man a long time ago."  (R. 73.)

Plaintiff also testified that he was diagnosed with 4th nerve palsy, which affects his vision.  (R. 54.)  He was diagnosed with this condition in the 1990s and has worked with the condition for the past fifteen years.  (R. 54.)  Although the condition was very slight at first, such that Plaintiff did not realize there was a problem, it became more pronounced to the point that Plaintiff has double vision.  (R. 55.)  To compensate for the condition while working, Plaintiff had to crank his neck back while digging, which became "intolerable."  (R. 55.)  Plaintiff stated that when he looks

18

straight ahead, he sees two images, one about six inches below the second.  (R. 55.)  By tilting his

neck back, he is able to correct his double vision because his eyes even out.  (R. 55.)    This

condition, according to Plaintiff, causes fatigue and stress because he has to compensate "all the

time and it's just intolerable."  (R. 57.)  Plaintiff indicated that he tried prism glasses for his visual

impairment, but they did not work.  (R. 70-71.)  According to Plaintiff:

> [W]hen you wear the prism glasses, okay, the double, the double
> object as I'm looking at it now, is, are, is supposed to fuse. . . . Fuse
> meaning come together. . . . And it would if I stayed rock solid
> straight.  The second that I would move, I mean, even I [sic] a
> micrometer, micro inch or whatever, it would un-fuse.  And me and
> the doctor were trying different lenses, different types of prism
> whatever, and it just did not work.

(R. 71.)

Plaintiff testified that he lives with his parents and does not have a social life.  (R. 50.)  He

can carry his laundry downstairs and wash it, but he does not fold his clothes well because of his

double vision.  (R. 58.)  Plaintiff vacuums the house, but it is difficult for him due to back pain.

(R. 60.)  He vacuums one room, then has to rest for fifteen or twenty minutes before vacuuming

the next room.  (R. 60.)  It takes him thirty minutes to vacuum each room, and he does not move

chairs or tables when he cleans.  (R. 60.)  Plaintiff prepares his own meals, but he has to compensate

for his double vision when using knives so he does not cut himself.  (R. 61-62.)

According to Plaintiff, his vision is affected by lighting, and fluorescent lighting is the

worst because objects in his vision do not "fuse" but seem farther apart.  (R. 62.)  He particularly

has difficulty shopping in stores due to lighting and now does most of his shopping online.  (R.

63-64.)  He only uses a computer once a day to check email or buy something online, and he does

not socialize online.  (R. 64-65.)  To stay busy, he tries to help around the house, but he has

difficulty because his back condition has worsened.  (R. 66.)  Plaintiff stated that he can lift a

gallon of milk and could lift a gallon of milk twenty times in an hour, but doing so would be painful. (R. 67.)  He would not be able to pick up a gallon of milk for two and a half hours in an eight hour day.  (R. 68.)   Plaintiff drives a car, but "very infrequently," and he only drives approximately a quarter mile when he drives.  (R. 71.)

## IV.    DISCUSSION

### A.    The RFC Determination

Plaintiff first asserts that the ALJ's finding that Plaintiff can perform work at all exertional levels, including heavy work, is not supported by substantial evidence. ECF No. 19 at 13.  Plaintiff specifically argues that the evidence – including the report of the consultative examiner, Dr. Eyassu – supports the diagnoses of 4th nerve palsy with double vision and limitation in vision, HIV, Hepatitis C, and chronic lower back pain.  *Id.* at 13-14.  Defendant responds that while Plaintiff is diagnosed with these conditions, the "mere presence" of medical impairments is insufficient to establish disability under the Social Security Act.  ECF No. 25 at 5.  Defendant also asserts that other than citing to the diagnoses, Plaintiff "points to no additional functional limitations resulting from these conditions not already included in the RFC assessment."  *Id.* at 6.

The ALJ considered the evidence of record concerning Plaintiff's lower back pain but concluded that the evidence did not support any exertional limitations in the RFC.  (R. 29.)  The ALJ specifically cited Dr. Eyassu's findings, which were largely negative and consistent with the progress notes from Paterson Counseling Center.  (R. 29.)  Although imaging studies of the lumbar spine performed on September 24, 2015 showed degenerative arthritis, the ALJ found that Plaintiff's back pain was resolvable through conservative treatment and did not "significantly impact on work related activities."  (R. 29.)  The ALJ also noted that Plaintiff's back condition did not involve any significant treatment "such as epidurals or surgery," and that Plaintiff had not

received treatment for his back other than one doctor's visit three weeks prior to the hearing.  (R. 30.)  In addition, the ALJ considered the RFC assessment from Plaintiff's treating physician, Dr. Willenborg, who found that Plaintiff had an extremely low RFC, but the ALJ accorded no significant weight to this assessment because the opinion was not supported by Dr. Willenborg's findings, the other evidence of record, or Plaintiff's testimony.  (R. 30.)

The Court finds that while the ALJ conducted an extensive analysis of the evidence of record, he failed to address one important piece of evidence: Dr. Eyassu's conclusion that Plaintiff "would need to avoid activity with heavy lifting."  (R. 375.)  The ALJ gave "significant weight" to the report of Dr. Eyassu, recounting Dr. Eyassu's findings from his evaluation of Plaintiff but ignoring Dr. Eyassu's recommendation regarding Plaintiff's exertional capability.  (R. 31.)  Having given "significant weight" to Dr. Eyassu's opinion, the ALJ should have undertaken efforts to resolve the inconsistency between Dr. Eyassu's evaluation – which demonstrated largely negative findings – and his conclusion that Plaintiff must avoid heavy lifting.  Because the ALJ failed to address Dr. Eyassu's conclusion despite giving "significant weight" to this opinion, the Court finds that this case must be remanded to the Commissioner because substantial evidence does not support the ALJ's RFC determination as to Plaintiff's exertional ability.

Plaintiff's second argument concerning his RFC is that the ALJ erred in his analysis of Plaintiff's visual impairment.  ECF No. 19 at 14.  The ALJ found that although Plaintiff was diagnosed with 4th nerve palsy with double vision, Plaintiff had "sufficient visual acuity to be able to handle and work with both large and small objects[.]"  (R. 31.)  The ALJ did include limitations in the RFC to address Plaintiff's vision impairment – precluding Plaintiff from working at unprotected heights and finding that Plaintiff must "avoid normal workplace hazards" (R. 27) – but he did not conclude that Plaintiff's visual impairment was disabling.  (R. 31.)  In so finding,

the ALJ noted the opinion of Plaintiff's treating physician, Dr. Bernstein, that Plaintiff's condition

could be corrected if Plaintiff used prism glasses or held his neck in a tilted position.  (R. 30-31.)

The ALJ also gave partial weight to the opinion of the state agency physician, who determined

that Plaintiff had depth perception issues but good visual acuity; the ALJ adopted the state agency

physicians' limitation that Plaintiff must avoid working at unprotected heights.  (R. 31, 100-101,

108.)  Plaintiff contends that the ALJ erred because he cited only Dr. Bernstein's initial observation

that Plaintiff's visual impairment might be corrected through the use of glasses and did not

consider Dr. Bernstein's subsequent opinion that prism glasses did not improve Plaintiff's

condition.  ECF No. 19 at 16.  Plaintiff also notes that it was error for the ALJ to rely on the state

agency physicians' opinions because the opinions were rendered in February 2014, at a time when

Dr. Bernstein was "uncertain as to [the] extent claimant will be able to work" (R. 98, 108), and

such opinions therefore did not take into account Dr. Bernstein's revised opinion as of September

2014.  *Id.* at 14-15.

    Dr. Bernstein first evaluated Plaintiff concerning his visual impairment on September 12,

2013.  (R. 389.)  He noted at that time that Plaintiff had 4th nerve palsy with spread and believed

that the condition could be controlled with "12 prism diopter BD OD and prism diopters BI OS."

(R. 389.)  In December 2013, Dr. Bernstein indicated that Plaintiff had a nine-year history of

diplopia as a result of the 4th nerve palsy and stated that he prescribed a pair of prism glasses in

an effort to control Plaintiff's condition.  (R. 387.)  Dr. Bernstein stated: "I do not know to what

extent he will be able to work – or may be limited to certain types of jobs bases on visual demands.

If his diplopia is completely controlled, he would then be able to work a 'normal job.'"  (R. 387.)

However, in September 2014, Plaintiff presented for a follow-up with Dr. Bernstein, at which time

Dr. Bernstein reported that Plaintiff's condition could not be controlled with prism glasses.  (R.

22

386.) Dr. Bernstein opined that because Plaintiff's condition could not be corrected with glasses, he did not recommend surgery, and he considered Plaintiff "disabled." (R. 386.)

In conducting his RFC analysis, the ALJ repeatedly noted that Plaintiff's vision impairment could be corrected by the use of glasses, but this statement is not supported by the evidence of record. Dr. Bernstein initially opined that Plaintiff's vision might be corrected with glasses, but he subsequently determined that glasses did not improve Plaintiff's vision and opined that Plaintiff is disabled. The ALJ rejected Dr. Bernstein's conclusion on disability, stating that the visual impairment could be corrected if Plaintiff wore glasses or held his neck in a tilted position. (R. 31.) Clearly, the ALJ's rejection of Dr. Bernstein's opinion is based, at least in part, on the erroneous premise that Plaintiff's visual impairment could be corrected with glasses.[8] Similarly, the adoption of the state agency physicians' opinions regarding the extent of Plaintiff's visual impairment is erroneous since those opinions did not take into account Dr. Bernstein's subsequent determination that Plaintiff's vision could not be corrected with glasses or surgery.

Because glasses or surgery cannot control Plaintiff's double vision, the only other means of correcting his vision is an adjustment in the positioning of Plaintiff's head. (R. 31.) Plaintiff testified that his double vision could be corrected if he stayed "rock solid straight," but "the second that [he] would move . . . even I [sic] a micrometer, micro inch or whatever," the double object would reappear. (R. 71.) The ALJ did not address this evidence in considering the limitations to include in Plaintiff's RFC. The ALJ instead noted that Plaintiff can drive a car and work on a computer, but such sedentary activities do not demonstrate that Plaintiff can perform a full range

---

[8] Additionally, the ALJ incorrectly noted that Plaintiff "stated that glasses also correct the problem," but Plaintiff testified that prism glasses did not correct his vision. (R. 71) ("The prism glasses were tried twice by two different doctors and failed. . . . And me and the doctor were trying different lenses, different types of prism whatever, and it just did not work.").

23

of activity while keeping his head "rock solid" in a tilted position.  Plaintiff's past work as a grave digger, for instance, required him to shovel dirt and maneuver 150 pound granite stones (R. 45-46), yet the ALJ did not analyze whether Plaintiff would be able to perform such tasks while keeping his head in a tilted position to avoid double vision, nor did he consider whether such tasks could be performed despite having double vision.  Plaintiff did perform his past work for several years with this condition, but he testified that the problem was only "very slight" at first and became more pronounced over the years to the point that the work became "intolerable."  (R. 55.)  Given the ALJ's failure to discuss this evidence in evaluating whether Plaintiff's vision impairment required additional limitations on his RFC, the Court finds that the ALJ's RFC assessment is not supported by substantial evidence and requires remand for further analysis.

### B.      The ALJ's Determination of Past Relevant Work

At Step Four, the ALJ must consider whether the claimant retains the RFC to perform past relevant work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  Step Four involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level or capability needed to perform the past relevant work.

*Garibay v. Comm'r of Soc. Sec.*, 336 F. App'x 152, 158 (3d Cir. 2009) (quoting *Burnett*, 220 F.3d at 120).

In this case, the Court is unable to determine whether the ALJ's determination concerning Plaintiff's past relevant work is supported by substantial evidence because the ALJ's written decision is incomplete at Step Four.  The ALJ conducted an extensive evaluation of Plaintiff's medical history to make specific findings of fact concerning Plaintiff's RFC, yet he failed to explain his conclusion that Plaintiff can perform his past relevant work given the limitations in the

RFC.  The entirety of the ALJ's analysis on this issue is as follows:

> The claimant has past relevant work as a Grave Digger (DOT # 406.684-010).  According to the vocational expert, this job was skilled and heavy.  According to the claimant, in this job, he had to lift up to 150 pounds.  He was dismissed from the cemetery for monetary reasons.  In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as actually and generally performed.

(R. 32.)  The RFC provides that Plaintiff must avoid "normal workplace hazards" and is "precluded from working at unprotected heights" (R. 27), yet there is no analysis of what might constitute an "unprotected height" or whether Plaintiff can perform his past work as a grave digger despite these limitations.  Rather, the ALJ ultimately concluded that because Plaintiff stopped working because he was laid off from his job – and not because of a physical inability to perform the work – Plaintiff is capable of performing his past relevant work.

The DOT description of Cemetery Worker/Gravedigger is as follows:

> Prepares graves and maintains cemetery grounds: Locates grave site according to section, lot, and plot numbers, and marks area to be excavated.  Removes sod from gravesite, using shovel.  Digs graves to specified depth, using pick and shovel or backhoe.  Places concrete slabs on bottom and around grave to line it.  Mixes and pours concrete to construct foundation for grave marker, using premixed concrete, wheelbarrow, and handtools.  Positions casket-lowering device on grave, covers dirt pile and sod with artificial grass carpet, erects canopy, and arranges folding chairs to prepare site for burial service.  Builds wooden forms for concrete slabs, using hammer, saw, and nails.  Sets grave marker in concrete on gravesite, using shovel and trowel.  Mows grass, using hand or power mower.  Prunes shrubs, trims trees, and plants flowers and shrubs on grave, using handtools.  Removes leaves and other debris from graves, using leaf blowers and weed eaters.  May drive vehicles, such as backhoe, trucks and tractors.  May repair and maintain tools and equipment, using handtools and power tools and applying mechanical knowledge.  May open and close mausoleum vaults, using handtools.

DICOT 406.684-010, 1991 WL 673339 (1991).  In addition, Plaintiff testified to the duties he

actually performed as a grave digger, including digging graves with a machine, maneuvering large boards over the grave once it was dug, lifting and maneuvering granite stones, which could weigh up to 150 pounds, shoveling dirt and raking.  (R. 45, 46.)

It appears to the Court that the job of grave digger, both as actually and generally performed, may require Plaintiff to work at unprotected heights.  The DOT job description provides that a grave digger must excavate a hole for a casket and work around that hole when positioning concrete slabs and casket-lowering devices and otherwise preparing the site for a burial service.  Plaintiff testified that he digs a hole with a machine and then maneuvers large boards over the hole.  The record contains no evidence concerning the depth of a standard grave, how far from the edge of the grave a worker is when preparing the site for a burial service, or whether the edge of the grave remains unprotected when a worker is performing such incidental duties.  Such evidence is critical to a determination of whether Plaintiff can perform his past relevant work notwithstanding a limitation in the RFC that he is "precluded from working at unprotected heights," yet the ALJ failed to make these factual findings.  At the very least, the ALJ was required to discuss how Plaintiff is able to perform his past relevant work despite the RFC limitation, but he did not do so.  The Court finds that remand is necessary to address these issues.

### C.    The ALJ's Evaluation of Plaintiff's Subjective Complaints

Finally, Plaintiff claims that the ALJ failed to properly evaluate or weigh his subjective claims as to the severity of his symptoms.  "Credibility determinations as to a claimant's testimony, regarding pain and other subjective complaints are for the ALJ to make."  *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)).  The ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process.  *See* 20 C.F.R. §§ 404.1529, 416.929.  First, the ALJ must determine

whether the record demonstrates that the claimant possesses a medically determinable impairment that could reasonably produce the alleged symptoms. *See Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 119-20 (3d Cir. 2016) ("[W]hile there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself.") (citations omitted). Second, the ALJ must assess the credibility of the claimant's complaints regarding the intensity of the symptoms. To do this, the ALJ must determine if objective medical evidence supports the claimant's complaints. If so, the complaints should be given great weight and "may not be disregarded unless there exists contrary medical evidence." *Id.*

If objective medical evidence does not support the claimant's complaints, then the ALJ must consider other factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii). The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling 96-7p, *Policy Interpretation Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at *4 (S.S.A. Jul. 2,

1996).[9]  The ALJ cannot simply state that the "allegations have been considered" or that they categorically are not credible.  *Id.* at *2.

Plaintiff complains that the ALJ failed to account for his allegations of fatigue arising from HIV and Hepatitis C.  The ALJ noted Plaintiff's complaints of fatigue in both medical records and the hearing testimony, but he also noted that the medical records are "replete" with statements that Plaintiff had only minimal or no complaints.  (R. 29.)  The ALJ thus rejected any assertion that the fatigue that Plaintiff experiences as a result of HIV or Hepatitis C is disabling in nature.  (R. 29.)  The Court finds no error in the ALJ's analysis with respect to allegations of fatigue.

Plaintiff also complains that the ALJ misstated the results of an abdominal ultrasound, which the ALJ found were normal but Plaintiff argues were not normal.  ECF No. 19 at 26.  Plaintiff notes that laboratory results demonstrate abnormal liver functioning.  *Id.* at 26-27.  Plaintiff further points to evidence that Plaintiff is losing weight and suffers from abdominal pain, bloating and nausea.  *Id.* at 27, 28, 30.  However, when pointing to evidence that Plaintiff believes demonstrates inconsistencies in the ALJ's reasoning concerning his medical impairments, he must "affirmatively identify evidence that the impairment imposes additional limitations on his or her functional capabilities."  *Gullace v. Colvin*, Civ. A. No. 15-7630 (FLW), 2017 WL 714356, at *10 (D.N.J. Feb. 23, 2017)(citing *Rutherford*, 399 F.3d at 553).  When alleging that an ALJ committed error in his or her analysis, "the party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.'"  *Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S. Ct. 1696, 173 L. Ed. 2d 532 (2009) (quoting *Palmer v. Hoffman*, 318 U.S. 109, 116, 63 S. Ct. 477, 87 L. Ed. 645 (1943)).  Plaintiff generally complains that the ALJ failed

---

[9] Social Security Ruling 96-7p applies to SSA decisions that, like the ALJ decision in this case, were made prior to March 28, 2016.

to consider this evidence, but he does not argue that such evidence would have required limitations on his ability to function in the workplace beyond those already contained in the RFC.  As such, the Court finds no basis to remand based on the ALJ's consideration of this evidence.

Some of Plaintiff's subjective complaints of pain, however, do impact the RFC analysis. The ALJ determined that Plaintiff's "activities of daily living are fully functional," noting that Plaintiff is able to maintain personal hygiene and grooming, care for his cats, and prepare light meals; he does chores around the house such as folding laundry and vacuuming; he uses a computer to check email and shop online; and he drives and shops in stores.  (R. 29-30.)  Plaintiff argues that his activities of daily living are limited and demonstrate that he cannot perform work at all exertional levels.  ECF No. 19 at 25.  Plaintiff notes that he has difficulty folding laundry due to his vision problems, vacuuming is difficult due to his back pain, he is unable to do yard work due to back pain, and he spends only limited time on the computer and driving.  *Id.*  According to Plaintiff, because he is only able to perform these activities for a limited period of time, they do not demonstrate that Plaintiff is "fully functional" as found by the ALJ and, in fact, are inconsistent with the ALJ's finding that Plaintiff can perform work at all exertional levels, including heavy work.  *Id.*

The ALJ rejected Plaintiff's complaints of lower back pain, noting Dr. Eyassu's findings and progress notes of Patterson Counseling Center.  (R. 29.)  As noted above, Dr. Eyassu concluded that Plaintiff must avoid heavy lifting, a finding that was never discussed by the ALJ but is consistent with Plaintiff's testimony concerning the pain he experiences in his back when vacuuming and doing yard work.  Plaintiff also complained that he experiences shortness of breath when walking up stairs due to COPD.  ECF No. 19 at 29.  The ALJ concluded that COPD did not impact Plaintiff's ability to work because "his shortness of breath issue has not affected his

activities of daily living [and] he gets no treatment." (R. 30.) However, the record contains medical evidence to confirm that Plaintiff has COPD, Plaintiff's testimony demonstrates that he experiences shortness of breath upon exertion, and this symptom should have been considered in determining whether Plaintiff could perform work at all exertional levels.

Also, as discussed above, the ALJ rejected Plaintiff's complaints of vision problems, noting Plaintiff's testimony that he uses a computer, drives, and can correct the problem by tilting his head, as well as Dr. Bernstein's initial opinion that the vision problem can be corrected with prism lenses. The Court already addressed the ALJ's failure to account for Plaintiff's testimony concerning his vision impairment and directs the Commissioner to reconsider such testimony on remand.

## VI.    CONCLUSION

For these reasons, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case to the Commissioner for further proceedings in accordance with the preceding instructions and the accompanying Order.


Dated:  February 18, 2020                      s/ Paul A. Zoss
At Newark, New Jersey                    PAUL A. ZOSS, U.S.M.J.